THE HONORABLE JAMES L. ROBART

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| *In Re: Zillow Group, Inc. Session Replay Software Litigation* | Master File No. 2:22-cv-01282-JLR |
| This Document Refers to: All Actions | MICROSOFT CORPORATION'S NOTICE OF SUPPLEMENTAL AUTHORITY |

## MICROSOFT CORPORATION'S NOTICE OF SUPPLEMENTAL AUTHORITY

Pursuant to Local Civil Rule 7(n), Microsoft notifies the Court of supplemental authority relevant to Microsoft's pending motion to dismiss. *See* Dkt. 54. Attached as Exhibit A is the order entered on November 22, 2023, granting defendant's motion to dismiss in *Farst v. Michaels Stores, Inc.*, No. 1:22-cv-1433 (M.D. Pa. Nov. 22, 2023). For the Court's convenience, also attached as Exhibit B is the First Amended Complaint in that same action.

The *Farst* court dismissed for lack of Article III standing where the plaintiff alleged that "Michaels intercepted her private information by using session replay software on its public website," and "failed to articulate what, if any, personal information she actually disclosed on Michaels' website." Ex. A at 2–3. The *Farst* court held that plaintiff "ha[d] failed to plausibly allege a concrete, intangible injury 'with a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts,'" as required by *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2204 (2021). *Id.* at 3. In so doing, the *Farst* court rejected the plaintiff's argument that "simply by visiting and shopping on Michaels' public website, which allegedly

tracks customers' browsing history, she suffered harms analogous to the common-law privacy torts of intrusion upon seclusion and public disclosure of information." *Id.* at 3 n.3.

The *Farst* case involved the same Clarity software at issue here. *See* Ex. B at ¶¶ 4, 10.

Dated: November 28, 2023

By: */s/ Nicola C. Menaldo*

Nicola C. Menaldo (SBN WA 44459)
Anna Mouw Thompson (SBN WA 52418)
**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Telephone: +1.206.359.8000
Facsimile: +1.206.359.9000
NMenaldo@perkinscoie.com
AnnaThompson@perkinscoie.com

James G. Snell (SBN CA 173070)
**Perkins Coie LLP**
3150 Porter Drive
Palo Alto, California 94304-1212
Telephone: +1.650.838.4300
Facsimile: +1.650.838.4350
JSnell@perkinscoie.com

*Attorneys for Defendant Microsoft Corporation*

MICROSOFT'S NOTICE OF
SUPPLEMENTAL AUTHORITY
(No. 2:22-cv-01282-JLR) –2

Perkins Coie LLP
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

EXHIBIT A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JENNIFER FARST, individually and on behalf of all others similarly situated,** | : : : : | **CIVIL ACTION NO. 1:22-CV-1433** |
| | : | **(Judge Conner)** |
| **Plaintiff** | : : | |
| **v.** | : : | |
| **MICHAELS STORES, INC.,** | : : | |
| **Defendant** | : | |

## ORDER

AND NOW, this 22nd day of November, 2023, upon consideration of the motion (Doc. 43) filed by defendant Michaels Stores, Inc. ("Michaels") to dismiss plaintiff Jennifer Farst's amended complaint (Doc. 37) pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(2), and 12(b)(6), and further upon consideration of the parties' respective briefs in support of and in opposition to said motion, (see Docs. 44, 47, 54), and their various notices of supplemental authority, (see Docs. 56, 59-71), and the court noting that when assessing a motion to dismiss under Rule 12(b)(1), it is the plaintiff's burden to establish jurisdiction, see Mortensen v. First Fed. Sav. & Loan Ass'n, 549 F.2d 884, 891 (3d Cir. 1977),[1] and the court "must only

---

[1] Such jurisdictional challenges take one of two forms: (1) parties may levy a "factual" attack, arguing that one or more of the pleading's factual allegations are untrue, removing the action from the court's jurisdictional ken; or (2) they may assert a "facial" challenge, which assumes the veracity of the complaint's allegations but nonetheless argues that a claim is not within the court's jurisdiction. See Lincoln Benefit Life Co. v. AEI Life, LLC, 800 F.3d 99, 105 (3d Cir. 2015) (quoting CNA v. United States, 535 F.3d 132, 139 (3d Cir. 2008)). Michaels raises a facial challenge to Farst's amended complaint. (See Doc. 44 at 7).

consider the allegations of the complaint and documents referenced therein and attached thereto, in the light most favorable to the plaintiff," see Gould Elec. Inc. v. United States, 220 F.3d 169, 176 (3d Cir. 2000) (citing Mortensen, 549 F.2d at 891; Pension Benefit Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir. 1993)), and the court further observing that Article III standing requires allegations that, *inter alia*, plaintiff "suffered an injury in fact," see Spokeo, Inc. v. Robins, 578 U.S. 330, 338 (2016) (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992)),[2] and when alleging an intangible harm, a plaintiff need not show "an exact duplicate in American history and tradition" but must at least identify "a close historical or common-law analogue for their asserted injury," see TransUnion, 141 S. Ct. at 2204, and the court noting that, in the matter *sub judice*, Farst's allegations that Michaels intercepted her private information by using session replay software on its public website, (see Doc. 37 ¶¶ 5, 15, 24, 70), are substantially similar, and in some respects identical, to allegations that this court recently deemed insufficient to establish Article III standing in an analogous case because they are not closely related to an injury recognized at common law, see Matthew Farst v. AutoZone, Inc., No. 1:22-CV-1435, Doc. 54 at 6-13 (M.D. Pa. Nov. 1, 2023)

---

[2] To establish an injury in fact, a plaintiff must show she "suffered an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical." See Spokeo, 578 U.S. at 339 (quoting Lujan, 504 U.S. at 560) (cleaned up). A plaintiff must allege she suffered a concrete injury "even in the context of a statutory violation." See TransUnion LLC v. Ramirez, 594 U.S. ___, 141 S. Ct. 2190, 2205 (2021) (quoting Spokeo, 578 U.S. at 341); see also Kamal v. J. Crew Grp., Inc., 918 F.3d 102, 110-11 (3d Cir. 2019). Concrete injuries fall into two broad categories: tangible and intangible harms. See TransUnion, 141 S. Ct. at 2204.

(Conner, J.); <u>see also</u> <u>id.</u> Doc. 1,[3] and the court observing that Farst added the acronym "PII"—short for "personally identifiable information"—to her amended complaint four times after the court granted her leave to amend, but she failed to articulate what, if any, personal information she actually disclosed on Michaels' website, (<u>see</u> Doc 37 ¶¶ 4, 30, 41, 46), and the court determining that Farst's conclusory allegations are legally untenable, <u>see</u> <u>Mathias v. Kershaw</u>, No. 1:09-CV-1515, 2010 WL 1329067, at *2-3 (M.D. Pa. Mar. 29, 2010) (Conner, J.), and the court finding that Farst has failed to plausibly allege a concrete, intangible injury "with a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts," <u>see</u> <u>TransUnion</u>, 141 S. Ct. at 2204 (citing <u>Spokeo</u>, 578 U.S. at 340-41),[4] and incorporating by reference the court's reasoning from our recent

---

[3] Like the plaintiff in <u>AutoZone</u>, Farst unpersuasively argues that, simply by visiting and shopping on Michaels' public website, which allegedly tracks customers' browsing history, she suffered harms analogous to the common-law privacy torts of intrusion upon seclusion and public disclosure of private information. (<u>See</u> Doc. 47 at 2-6). Farst's amended complaint similarly lacks any allegations that Michaels engaged in deceit or made any sort of promise not to record her interactions on its publicly accessible website—the kinds of allegations that our court of appeals has found sufficient to establish Article III standing. <u>See</u> <u>In re</u> <u>Google Inc. Cookie Placement Consumer Priv. Litig.</u>, 934 F.3d 316, 325 (3d Cir. 2019); <u>In re</u> <u>Nickelodeon Consumer Priv. Litig.</u>, 827 F.3d 262, 295 (3d Cir. 2016).

[4] Other courts within our circuit have similarly found that a company's tracking of a customer's shopping activity using session replay software is not closely related to a common-law privacy tort. <u>See, e.g.</u>, <u>Cook v. GameStop, Inc.</u>, --- F. Supp. 3d ----, No. 2:22-CV-1292, 2023 WL 5529772, at *4-5 (W.D. Pa. Aug. 28, 2023); <u>Massie v. Gen. Motors LLC</u>, No. 21-CV-787, 2022 WL 534468, at *5 (D. Del. Feb. 17, 2022). Various courts in other circuits have reached the same conclusion based on similar allegations. <u>See</u> <u>Popa v. PSP Grp., LLC</u>, No. 23-294, 2023 WL 7001456, at *1, 4 (W.D. Wash. Oct. 24, 2023); <u>Jones v. Bloomingdales.com, LLC</u>, No. 4:22-CV-1095, 2023 WL 6064845, at *2 (E.D. Mo. Sept. 18, 2023); <u>Adams v. PSP Grp., LLC</u>, --- F. Supp. 3d ---, No 4:22-CV-1210, 2023 WL 5951784, at *7-8 (E.D. Mo. Sept. 13, 2023); <u>Straubmuller v. Jetblue Airways Corp.</u>, No. 23-CV-384, 2023 WL 5671615, at *4-5 (D.

memorandum in <u>AutoZone</u>, <u>see</u> <u>AutoZone</u>, No. 1:22-CV-1435, Doc. 54, and the court

concluding that Farst has thus failed to establish Article III standing, it is hereby

ORDERED that:

1.     Michaels' motion (Doc. 43) to dismiss pursuant to Rule 12(b)(1) is GRANTED. Farst's amended complaint is DISMISSED for want of subject-matter jurisdiction and without prejudice.[5]

2.     To the extent Michaels' motion (Doc. 43) seeks dismissal of Farst's amended complaint pursuant Rules 12(b)(2) and 12(b)(6), those grounds for the motion are DENIED as moot.

3.     Farst is granted leave to file a second amended complaint within 21 days of the date of this order.

4.     In the absence of a timely filed second amended complaint, the Clerk of Court shall CLOSE this case.

/S/ CHRISTOPHER C. CONNER
Christopher C. Conner
United States District Court
Middle District of Pennsylvania

---

Md. Sept. 1, 2023); <u>Mikulsky v. Noom, Inc.</u>, --- F. Supp. 3d ----, No. 3:23-CV-285, 2023 WL 4567096, at *5 (S.D. Cal. July 17, 2023); <u>Lightoller v. Jetblue Airways Corp.</u>, No. 23-CV-361, 2023 WL 3963823, at *4 (S.D. Cal. June 12, 2023); <u>Byars v. Sterling Jewelers, Inc.</u>, No. 5:22-CV-1456, 2023 WL 2996686, at *3 (C.D. Cal. Apr. 5, 2023); <u>see also</u> <u>I.C. v. Zynga, Inc.</u>, 600 F. Supp. 3d 1034, 1049-50 (N.D. Cal. 2022); <u>Goldstein v. Costco Wholesale Corp.</u>, 559 F. Supp. 3d 1318, 1321 (S.D. Fla. 2021).

[5] Courts generally should grant leave to amend when an amendment "is not facially meritless" and justice so requires. <u>See</u> <u>Newark Branch, N.A.A.C.P. v. Town of Harrison</u>, 907 F.2d 1408, 1417 (3d Cir. 1990); <u>see also</u> FED R. CIV. P. 15(a)(2); <u>cf.</u> <u>Phillips v. Allegheny County</u>, 515 F.3d 224, 245 (3d Cir. 2008). Farst does not seek leave to file a second amended complaint, but many of the deficiencies identified herein with respect to the concreteness of Farst's asserted injury are factual and thus potentially curable. We will provide Farst an opportunity to cure these deficiencies by granting her leave to file a second amended complaint.

EXHIBIT B

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA
### HARRISBURG DIVISION

| | |
|---|---|
| JENNIFER FARST, *individually and on behalf of all others similarly situated*, | Case No. 1:22-cv-01433 |
| Plaintiff, | **CLASS ACTION** |
| v. | **JURY TRIAL DEMANDED** |
| MICHAELS STORES, INC., | |
| Defendant. | |

## FIRST AMENDED CLASS ACTION COMPLAINT

Plaintiff Jennifer Farst brings this class action against Defendant Michaels Stores, Inc. and alleges as follows upon personal knowledge as to Plaintiff and Plaintiff's own acts and experiences, and, as to all other matters, upon information and belief, including investigation conducted by Plaintiff's attorneys.

## NATURE OF THE ACTION

1.    "Since the advent of online behavioral advertising ('OBA') in the late 1990s, businesses have become increasingly adept at tracking users visiting their websites." *Popa v. Harriet Carter Gifts, Inc.*, 426 F. Supp. 3d 108, 111 (W.D. Pa. 2019) (citations omitted).  This case involves one of the most egregious examples of such consumer tracking and Internet privacy violations.

2.    Plaintiff brings this case as a class action under the Pennsylvania Wiretapping and Electronic Surveillance Control Act, 18 Pa. Cons. Stat. 5701, *et seq.* ("WESCA").  The case stems from Defendant's unlawful procurement of the interception of Plaintiff's and Class members'

electronic communications through the use of third party "session replay" spyware that allowed

an undisclosed third party to record Plaintiff's and the Class members' visits to its website.

3.    A recent paper addressed the growing concern held by consumers regarding their

digital privacy, indicating how most website visitors will assume their detailed interactions with a

website will only be used by that website host and not be shared with any unknown third parties.[1]

As such, website visitors reasonably expect that their interactions with a website should not be

released to third parties unless explicitly stated.[2] According to a study by the Pew Research Center,

a majority of Americans are concerned about how data is collected about them by companies.[3]

These concerns are evident by user actions consistent with that expectation of privacy. For

example, following a new rollout of the iPhone operating software—which asks users for clear,

affirmative consent before allowing companies to track users—85 percent of worldwide users and

94 percent of U.S. users chose not to allow such tracking.[4]

4.    As discussed in detail below, Defendant ignored these concerns and, instead,

procured and utilized "session replay" spyware from third party Session Replay Providers, namely

Microsoft Clarity and CrazyEgg, who contemporaneously intercepted to intercept Plaintiff's and

the Class members' electronic computer-to-computer data communications with Defendant's

---

[1] *CUJO AI Recent Survey Reveals U.S. Internet Users Expectations and Concerns Towards Privacy and Online Tracking*, CUJO (May 26, 2020), https://www.prnewswire.com/news-releases/cujo-ai-recent-survey-reveals-us-internet-users-expectations-and-concerns-towards-privacy-and-online-tracking-301064970.html

[2] Frances S. Grodzinsky, Keith W. Miller & Marty J. Wolf, *Session Replay Scripts: A Privacy Analysis*, The Information Society, 38:4, 257, 258 (2022)

[3] *Americans and Privacy: Concerned, Confused, and Feeling Lack of Control Over Their Personal Information*, Pew Research Center, (Nov. 15, 2019), https://www.pewresearch.org/internet/2019/11/15/americans-and-privacy-concerned-Confusedand-feeling-lack-of-control-over-their-personal-information/

[4] Margaret Taylor, *How Apple screwed Facebook*, Wired, (May 19, 2021), https://www.wired.co.uk/article/apple-ios14-facebook.

website, including how they interacted with the website, their mouse movements and clicks, keystrokes, search terms, information and PII inputted into the website, and pages and content viewed while visiting the website.  Defendant facilitated a third party's interception, recording, processing and storage of electronic communications created through the webpages visited by Plaintiff and the Class members, as well as everything Plaintiff and the Class members did on those pages, *e.g.*, what they searched for, what they looked at, the information and personal details they inputted, and what they clicked on.

5.      Defendant knowingly and intentionally procured undisclosed third parties to intercept the electronic communications at issue without the knowledge or prior consent of Plaintiff or the Class members.  Defendant did so for its own financial gain and in violation of Plaintiff's and the Class members' rights to be free of intrusion upon their private affairs and to control information concerning their person under the WESCA.

6.      The third party "session replay" spyware procured and utilized by Defendant is not a traditional website cookie, tag, web beacon, or analytics tool.  It is a sophisticated computer software that allows the Session Replay Provider to contemporaneously intercept, capture, read, observe, re-route, forward, redirect, and receive incoming electronic communications to Defendant's website.  Plaintiff's and the Class members' electronic communications are then interpreted, reproduced, and stored at Defendant's behest using outside vendor(s)'s services and can later be viewed and utilized by Defendant as a session replay, which is essentially a video of a Class member's entire visit to Defendant's website, including all of their actions.

7.      "Technological advances[,]" such as Defendant's use of session replay technology, "provide 'access to a category of information otherwise unknowable' and 'implicate privacy concerns' in a manner different from traditional intrusions as a 'ride on horseback' is

different from 'a flight to the moon.'" *Patel v. Facebook, Inc.*, 932 F.3d 1264, 1273 (9th Cir. 2019) (quoting *Riley v. California*, 573 U.S. 373, 393 (2014)).

8. The CEO of a major "session replay" software company – while discussing the merger of his company with another "session replay" provider – publicly exposed why companies like Defendant engage in recording visitors to their websites: "The combination of Clicktale and Contentsquare heralds an ***unprecedented goldmine of digital data*** that enables companies to interpret and predict the impact of any digital element -- including user experience, content, price, reviews and product -- on visitor behavior[.]" *See Contentsquare Acquires Clicktale to Create the Definite Global Leader in Experience Analytics*, available at www.prnewswire.com/news-releases/contentsquare-acquires-clicktale-to-create-the-definitive-global-leader-in-experience-analytics-300878232.html (last accessed May 10, 2021) (emphasis supplied). This CEO further admitted that "this unique data can be used to activate custom digital experiences in the moment via an ecosystem of over 50 martech partners. With a global community of customers and partners, ***we are accelerating the interpretation of human behavior online and shaping a future of addictive customer experiences***." *Id.* (emphasis supplied).

9. Unlike typical website analytics services that provide aggregate statistics, the third party session replay technology utilized by Defendant is intended to capture and record electronic communications on Defendant's website and then process those communications to create a playback of individual browsing sessions, as if someone is looking over a Class members' shoulder when visiting Defendant's website. The technology also permits companies like Defendant to view the interactions of visitors on their website in real-timee.

10.     The following screenshots provide an example of a typical recording of a visit to a website captured utilizing session replay software, which includes mouse movements, keystrokes and clicks, search terms, content viewed, and personal information inputted by the website visitor:

**MICROSOFT CLARITY:**



**CRAZYEGG:**



5

11.     The purported use of session replay technology is to monitor and discover broken website features.  However, the extent and detail of the data collected by the Session Replay Providers for users of the technology, such as Defendant, far exceeds the stated purpose and Plaintiff's and the Class members' reasonable expectations when visiting websites like Defendant's.  The technology not only allows the recording and viewing of a visitor's detailed electronic communications with a website, but also allows the user to create a detailed profile for each visitor to the site.  Indeed, in an ongoing patent dispute, a well-known session replay provider openly admitted that this type of technology is utilized by companies like Defendant to make a profit: **"[the] software computes billions of touch and mouse movements and transforms this knowledge into profitable actions that increase engagement, reduce operational costs, and maximize conversion rates (i.e., the percentage of users who take desired actions on a website, such as purchasing a product offered for sale)."**  *Content Square SAS v. Quantum Metric, Inc.,* Case No. 1:20-cv-00832-LPS, Compl. at ¶8, [DE 1] (D. Del. Jun. 22, 2020) (emphasis supplied).

12.     Moreover, the collection and storage of page content creates a material risk that sensitive information and other personal information displayed on a page will leak to additional third parties. This may expose website visitors to identity theft, online scams, and other unwanted behavior.

13.     In 2019, Apple warned application developers using session replay technology that they were required to disclose such tracking and recording to their users, or face being immediately removed from the Apple Store: "Protecting user privacy is paramount in the Apple ecosystem. Our App Store Review Guidelines require that apps request explicit user consent and provide a clear

visual indication when recording, logging, or otherwise making a record of user activity."
https://techcrunch.com/2019/02/07/apple-glassbox-apps/ (last visited Mar. 16, 2021).

14. Consistent with Apple's concerns, countless articles have been written about the privacy implications of recording user interactions during a visit to a website, including the following examples:

(a) *The Dark Side of 'Replay Sessions' That Record Your Every Move Online*, located at https://www.wired.com/story/the-dark-side-of-replay-sessions-that-record-your-every-move-online/ (last visited April 18, 2023);

(b) *Session-Replay Scripts Disrupt Online Privacy in a Big Way*, located at https://www.techrepublic.com/article/session-replay-scripts-are-disrupting-online-privacy-in-a-big-way/ (last visited April 18, 2023);

(c) *Are Session Recording Tools a Risk to Internet Privacy?*, located at https://mopinion.com/are-session-recording-tools-a-risk-to-internet-privacy/ (last visited April 18, 2023);

(d) *Session Replay is a Major Threat to Privacy on the Web*, located at https://www.itnews.com.au/news/session-replay-is-a-major-threat-to-privacy-on-the-web-477720 (last visited April 18, 2023);

(e) *Session Replay Scripts Could be Leaking Sensitive Data*, located at https://medium.com/searchencrypt/session-replay-scripts-could-be-leaking-sensitive-data-5433364b2161 (last visited April 18, 2023);

(f) *Website Owners can Monitor Your Every Scroll and Click*, located at https://www.digitalinformationworld.com/2020/02/top-brands-and-websites-can-monitor-your-every-scroll-and-click.html (last visited April 18, 2023); and

7

(g) **Sites Using Session Replay Scripts Leak Sensitive User Data**, located at https://www.helpnetsecurity.com/2017/11/20/session-replay-data-leak (last visited April 18, 2023).

15.     In sum, Defendant procured the interception of the electronic communications of Plaintiff and the Class members through their visits to its website, causing them injuries, including violations of their substantive legal privacy rights under the WESCA, invasion of their privacy, intrusion upon their private affairs, and interference with their right to control, and potential additional exposure of, their private information.

16.     Through this action, Plaintiff seeks damages authorized by the WESCA on behalf of herself and the Class members, defined below, and any other available legal or equitable remedies to which they are entitled.

## PARTIES

17.     Plaintiff is, and at all times relevant hereto was, a natural person and a permanent resident of the State of Pennsylvania.

18.     Defendant is, and at all times relevant hereto was, a corporation duly organized and validly existing under the laws of Delaware and maintains its principal place of business in Texas. Defendant is therefore a citizen of Delaware and Texas.

## JURISDICTION AND VENUE

19.     This Court has personal jurisdiction over Defendant under Pennsylvania's long arm statute. Pa. Const. Stat.§ 5322.  Defendant specifically directs, markets, and provides its business activities throughout the State of Pennsylvania, and makes its active commercial website, including Pennsylvania specific material, available to residents of Pennsylvania for those interested in entering into contracts over the Internet with Defendant. Defendant is registered to

do business in the State of Pennsylvania, maintains *54* brick and mortar retail locations in Pennsylvania, and employs countless individuals in Pennsylvania. In fact, as of April 18, 2023, Defendant has 168 job postings on Indeed.com for positions servicing its Pennsylvania-based activities, including positions specific to facilitating the website purchasing initiated from Pennsylvania Consumers. *See Exhibit A*. Upon information and belief, Defendant spends significant funds advertising its services in Pennsylvania and driving Pennsylvania consumers to its website and its Pennsylvania retail locations. Indeed, Defendant's website allows consumers to make purchases which are picked up at its 54 Pennsylvania brick-and-mortar retail locations, RSVP for events held at its Pennsylvania locations, and take advantage of Pennsylvania specific promotions.

20.     During the relevant time frame, Defendant solicited and processed Pennsylvania purchases with residents of Pennsylvania for the sale of goods that involved the knowing and repeated transmission of computer data over the Internet. This resulted in Defendant generating extensive revenue from sales to residents of Pennsylvania, as well accepting payments from Pennsylvania residents through the site and ultimately driving significant sales to its Pennsylvania locations through Pennsylvania residents who originated through the website, as well as shipping products to Pennsylvania. Plaintiff's and the Class members' claims arise directly from Defendant's operation of its website and its targeting of Pennsylvania. Accordingly, Defendant has purposely availed itself of the privilege of conducting activities within the State of Pennsylvania

21.     Further, this Court has personal jurisdiction over Defendant because Defendant's tortious conduct against Plaintiff occurred in substantial part within this District and because Defendant committed the same wrongful acts to other individuals within this judicial District, such

that Defendant's acts complained of herein occurred within this District, subjecting Defendant to jurisdiction here. *See Popa v. Harriet Carter Gifts, Inc.*, 52 F.4th 121, 132 (3d Cir. 2022) ("the place of interception is the point at which the signals were routed to [the session replay provider's] servers"). Thus, Defendant knew or should have known that it was causing harm to those individuals while they were in Pennsylvania such that it was foreseeable to Defendant that its interceptions would harm Plaintiff and other similarly-situated individuals located in Pennsylvania.

22.     This court has subject matter jurisdiction under 28 U.S.C. § 1332(d)(2) because at least one member of the putative class, including Plaintiff, is a citizen of Pennsylvania, and Defendant is a citizen of Delaware and Texas, thus CAFA's minimal diversity requirement is met. Additionally, Plaintiff seeks, at minimum, $1,000.00 in damages for each violation, which, when aggregated among a proposed class of over 5,000, exceeds the $5,000,000 threshold for federal court jurisdiction under the Class Action Fairness Act ("CAFA").

23.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and (c) because Defendant is deemed to reside in any judicial district in which it is subject to personal jurisdiction, and because a substantial part of the events or omissions giving rise to the claim occurred in this District, and because Plaintiff was injured in this District.

24.     Plaintiff has Article III standing to maintain this action because she suffered a cognizable and particularized injury as a result of Defendant's violations of the WESCA, and because she is not requesting an advisory opinion from this Court.  Thus, Plaintiff has a sufficient stake in a justiciable controversy and seeks to obtain judicial resolution of that controversy. At common law, Defendant's conduct and the resulting harm suffered by Plaintiff would amount to an invasion of privacy, such as intrusion upon seclusion, of which the intrusion itself is sufficient

injury for standing. *See Campbell v. Facebook, Inc.*, 951 F.3d 1106, 1111 (9th Cir. 2020) ("under the privacy torts that form the backdrop for these modern [wiretapping] statutes, the intrusion itself makes the defendant subject to liability... Thus, historical practice provides [] support... for the conclusion that a wiretapping plaintiff need not allege any further harm to have standing"); *see also Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 423, (2013) (the "interception of a private [communication] amounts to an injury that is 'concrete and particularized'.").

## FACTS

25.     Defendant owns and operates the following website: www.michaels.com.

26.     Over the past year, Plaintiff visited Defendant's website approximately 12 or more times.

27.     Plaintiff most recently visited Defendant's website on or about August 2022.

28.     Plaintiff was in Pennsylvania during each visit to Defendant's website.

29.     During her visits to the website, Plaintiff, through her computer and/or mobile device, transmitted substantive information via electronic communications in the form of instructions to Defendant's computer servers utilized to operate the website.[5]  The commands were sent as messages instructing Defendant what content was being viewed, clicked on, requested and/or inputted by Plaintiff.

30.     The communications sent by Plaintiff to Defendant's (and unknowingly to the Session Replay Provider(s)'s) servers included, but were not limited to, the following actions taken by Plaintiff while on the website: mouse clicks and movements, keystrokes, search terms,

---

[5] These communications occur through the Hypertext Transfer Protocol ("HTTP"). HTTP works as a request-response protocol between a user and a server as the user navigates a website. A GET request is used to request data from a specified source. A POST request is used to send data to a server. *See HTTP Request Methods,* located at https://www.w3schools.com/tags/ref_httpmethods.asp (last visited November 16, 2022).

information and PII inputted and communicated by Plaintiff, pages and content viewed by Plaintiff, scroll movements, and copy and paste actions.

31.     Defendant responded to Plaintiff's electronic communications by processing and supplying – through its website – the information inputted and requested by Plaintiff. *See Revitch v. New Moosejaw, LLC*, No. 18-cv-06827-VC, 2019 U.S. Dist. LEXIS 186955, at *3 (N.D. Cal. Oct. 23, 2019) ("This series of requests and responses — whether online or over the phone — is communication."); *see also Popa v. Harriet Carter Gifts, Inc*., No. 21-2203, 2022 U.S. App. LEXIS 28799 (3d Cir. Oct. 18, 2022).

32.     At virtually the exact moment that Plaintiff sent communications to Defendant's servers, the session replay software procured by Defendant instantaneously created a duplicate request-and-response transmission of each of Plaintiff's communications and routed these communications to the Session Replay Provider's servers, akin to "auto-forwarding" an email as it is sent but before it has been received.

33.     Plaintiff reasonably expected that her visits to Defendant's website would be private and that Defendant would not have procured a third party that was tracking, recording, and/or watching Plaintiff as she browsed and interacted with the website, particularly because Plaintiff was never presented with any type of pop-up disclosure or consent form alerting Plaintiff that her visits to the website were being recorded by Defendant through a third party.

34.     Plaintiff reasonably believed that she was interacting privately with Defendant's website, and not that she was being recorded and that those recordings would be captured and transmitted by and to third party servers that Plaintiff was unaware of, where they would be processed by that third party and could later be watched by Defendant's employees, or worse yet, live while Plaintiff was on the website.

12

35.     Upon information and belief, over at least the past two years, Defendant has had embedded within its website's code and has continuously operated at least one session replay script[6] that was provided by a third party (a "Session Replay Provider").  The session replay spyware was always active and intercepted every incoming data communication to Defendant's website the moment a visitor accessed the site.

36.     The Session Replay Provider(s) that provided the session replay spyware to Defendant is not a provider of wire or electronic communication services, or an internet service provider.

37.     Defendant is not a provider of wire or electronic communication services, or an internet service provider.

38.     Defendant's use of session replay spyware was not instrumental or necessary to the operation or function of Defendant's website or business.

39.     Defendant's use of a session replay spyware through a Session Replay Provider to intercept Plaintiff's electronic communications was not instrumental or necessary to Defendant's provision of any of its goods or services. Rather, the level and detail of information surreptitiously collected by Defendant's Session Replay Provider(s) indicates that the only purpose was to gain an unlawful understanding of the habits and preferences of users to its website, and the information collected was solely for Defendant's and its Session Replay Providers own benefit.

40.     Defendant's use of a session replay spyware procured from a third party to intercept Plaintiff's electronic communications did not facilitate, was not instrumental, and was not

---

[6] A script is a sequence of computer software instructions.

incidental to the transmission of Plaintiff's and the Class members' electronic communications with Defendant's website.

41.     Upon information and belief, during one or more of Plaintiff's visits to Defendant's website, Defendant utilized session replay spyware procured from third parties to intentionally and contemporaneously intercept the substance of Plaintiff's electronic communications with Defendant's website, including mouse clicks and movements, keystrokes, search terms, information and PII inputted by Plaintiff, pages and content viewed by Plaintiff, and scroll movements, and copy and paste actions.  In other words, Defendant utilized its Session Replay Provider(s) to intercept, record, process and store electronic communications conveying everything Plaintiff did on the webpages visited by Plaintiff i.e. what Plaintiff searched for, what Plaintiff looked at, and the detailed personal information that Plaintiff inputted.

42.     The session replay spyware intentionally utilized by Defendant contemporaneously intercepted the electronic computer-to-computer data communications between Plaintiff's computer and/or mobile device and the computer servers and hardware utilized by Defendant to operate its website – as the communications were being transmitted from Plaintiff's computer and/or mobile device to Defendant's computer servers and hardware – and copied and sent and/or re-routed the communications to a storage file within the Session Replay Provider(s)'s server(s). The intercepted data was transmitted contemporaneously to the Session Replay Provider(s) server(s) as it was sent from Plaintiff's computer and/or mobile device.

43.     The relevant facts regarding the full parameters of the communications intercepted and how the interception occurred are solely within the possession and control of Defendant.

44.     The session replay spyware utilized by Defendant is not a website cookie, standard analytics tool, tag, web beacon, or other similar technology.

45.     Unlike the harmless collection of an internet protocol address, the data collected by Defendant identified specific information inputted and content viewed, and thus revealed personalized and sensitive information about Plaintiff including her internet activity and habits.

46.     The electronic communications intentionally intercepted at Defendant's behest were content generated through Plaintiff's intended use, interaction, and communication with Defendant's website relating to the substance, purport, and/or meaning of Plaintiff's communications with the website, *i.e.*, mouse clicks and movements, keystrokes, search terms, personal information and PII inputted by Plaintiff, and pages and content clicked on and viewed by Plaintiff.

47.     The electronic communications intentionally intercepted by Defendant were not generated automatically and were not incidental to Plaintiff's communications.

48.     The session replay spyware procured and utilized by Defendant intercepted, copied, replicated, and sent the data to the Session Replay Provider(s) in a manner that was undetectable by Plaintiff.

49.     Plaintiff's electronic data communications were then, processed, interpreted, stored and reproduced by Defendant and/or the Session Replay Provider(s).

50.     The electronic data communications were not only intercepted and stored, could also be used by Defendant to create a video playback of Plaintiff's visit to the website, displaying the content communicated by Plaintiff during her interactions with the site. Additionally, upon information and belief, the session replay technology procured by Defendant gave Defendant the ability to view Plaintiff's website visits live in real-time as they were occurring.

51.     Defendant's procured interception of Plaintiff's electronic communications allowed Defendant to capture, observe, and divulge Plaintiff's personal details, interests, browsing history, queries, and habits as she interacted with and browsed Defendant's website.

52.     Upon information and belief, Defendant similarly procured the interception of the electronic communications of at least 5,000 individuals located in Pennsylvania who visited Defendant's website.

53.     Defendant utilized third party spyware embedded within its website to intercept the communications at issue.

54.     Defendant never alerted or asked Plaintiff or the Class Members for permission to have its Session Replay Provider(s) intercept and record their visits to Defendant's Website using "session replay" spyware.

55.     Plaintiff and the Class members never consented to interception of their electronic communications by Defendant and/or it's Session Replay Provider(s) or anyone acting on Defendant's behalf, and they were never given the option to opt out of Defendant's recording.

56.     At no point in time did Plaintiff or the Class members provide Defendant, its employees, or agents with consent to intercept their electronic communications using "session replay" spyware.

57.     At no point in time did Plaintiff or the Class members specifically, clearly, and unmistakably consent to Defendant's use of a third party to intercept and record their electronic communications using "session replay" spyware.

58.     At no point in time did Plaintiff or the Class members specifically, clearly, and unmistakably consent to Defendant's use of a third party to intercept and record of their visits to Defendant's Website using "session replay" spyware.

59.     At no point in time did Plaintiff or the Class members impliedly consent to Defendant's use of a third party to intercept and record their electronic communications, as no reasonable person could assume that by communicating with Defendant's website, the substance of those electronic communications would be intercepted, captured, read, observed, re-routed, forwarded, interpreted, reproduced, and stored by an undisclosed third party Session Replay Provider.

60.     Plaintiff and the Class members did not have a reasonable opportunity to discover Defendant's unlawful interceptions because Defendant did not disclose the third party interception nor seek consent from Plaintiff and the Class members prior to interception of their communications.

61.     Plaintiff and the Class members never clicked or otherwise agreed to any disclosure or consent form authorizing Defendant to use a third party Session Replay Provider to intercept Plaintiff's and the Class members' electronic communications using "session replay" spyware.

62.     Defendant's third party session replay spyware intercepted Plaintiff's and the Class members' electronic communications from the moment they landed on Defendant's Website, and before they had an opportunity to even consider consenting or agreeing to any privacy or terms of use policy on the Website.   In other words, Defendant's unlawful interception occurred before Plaintiff and the Class members were given an opportunity to review, let alone provide prior consent, to any language that Defendant may claim purportedly authorized its violations of the WESCA. *See Javier v. Assurance IQ, LLC*, No. 21-16351, 2022 U.S. App. LEXIS 14951, at \*5 (9th Cir. May 31, 2022).

63.     In fact, Defendant's website's privacy policy and terms of use do not appear anywhere conspicuous when navigating its website or completing a purchase other than inconspicuous hyperlinks in the footer of Defendant's webpages.

64.     Moreover, Defendant's website failed to explicitly alert or otherwise notify Plaintiff and the Class members that Defendant would be utilizing session replay spyware to facilitate an undisclosed third party's monitoring and recording of their interactions with Defendant's Website.

65.     Additionally, upon immediately landing on Defendant's website, Plaintiff and the Class members were not alerted that by entering the website Defendant would unilaterally attempt to bind them to Defendant's terms of use and policies or privacy policy.  Indeed, the landing page to Defendant's website not only fails to advise visitors that Defendant is using a third party to intercept their electronic communications, it does not contain any type of conspicuous disclosure regarding Defendant's terms of use or privacy policy.

66.     Plaintiff and the Class members were not immediately required to click on any box or hyperlink containing Defendant's terms of use or privacy policy upon visiting the website or in order to navigate through the website.

67.     Plaintiff and the Class members were not placed on notice of Defendant's terms and policies or privacy policy upon immediately visiting the website.  Instead, Defendant's terms of use and privacy policy are buried at the bottom of Defendant's website where Plaintiff and the Class members were unable to see them.  These inconspicuous footer hyperlinks are insufficient to have put Plaintiff and the Class members on inquiry notice of Defendant's terms of use and privacy policy. *See Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1177 (9th Cir. 2014).

68.     Defendant does not require visitors to its website to immediately and directly acknowledge that the visitor has read Defendant's terms of use or privacy policy before proceeding to the site, browsing, or making a purchase.  In other words, Defendant's website does not immediately direct visitors to the site to the terms of use or privacy policy, and does not require visitors to click on a box to acknowledge that they have reviewed the terms and conditions/policy in order to proceed to the website.

69.     Upon information and belief, at least one of the purposes of Defendant's interception of Plaintiff's and the Class members' electronic communications was to allow Defendant to learn of Plaintiff's and the Class members' personal details, preferences and likes, which would then be used to market Defendant's services and goods to Plaintiff and the Class members.

70.     The surreptitious third party interception of Plaintiff's and the Class members' electronic communications procured by Defendant caused Plaintiff and the Class members harm, including violations of their substantive legal privacy rights under the WESCA, invasion of privacy, intrusion upon seclusion, invasion of their rights to control information concerning their person, and/or the exposure of their private information. Indeed, at common law, the intrusion into Plaintiff's and the Class members' private lives is of itself a cognizable injury. Moreover, Defendant's practices caused harm and a material risk of harm to Plaintiff's and the Class Members' privacy and interest in controlling their personal information, habits, and preferences.

## CLASS ALLEGATIONS

**PROPOSED CLASS**

71.     Plaintiff brings this lawsuit as a class action on behalf of all other similarly situated persons pursuant to Federal Rule of Civil Procedure 23.   The "Class" that Plaintiff seeks to represent is defined as:

> **All persons residing within the State of Pennsylvania (1) who visited Defendant's website and (2) whose electronic communications were intercepted by Defendant or on Defendant's behalf (3) without their prior consent.**

72.     Defendant and its employees or agents are excluded from the Class. Plaintiff reserves the right to modify or amend the Class definitions, as appropriate, during the course of this litigation.

**NUMEROSITY**

73.     The Class members are so numerous that individual joinder of all Class members is impracticable. Upon information and belief, Defendant intercepted the electronic communications of over 5,000 individuals. Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include notice on Defendant's website, U.S. Mail, electronic mail, Internet postings, and/or published notice.

74.     The identities of the Class members are unknown at this time and can be ascertained only through discovery.   Identification of the Class members is a matter capable of ministerial determination from Defendant's records kept in connection with its unlawful interceptions.

**COMMON QUESTIONS OF LAW AND FACT**

75.     There are numerous questions of law and fact common to the Class which predominate over any questions affecting only individual members of the Class.   Among the questions of law and fact common to the Class are:

(1) Whether Defendant violated the WESCA;

(2) Whether Defendant intercepted or procured another to intercept Plaintiff's and the Class members' electronic communications;

(3) Whether Defendant disclosed to Plaintiff and the Class Members that it was intercepting their electronic communications;

(4) Whether Defendant secured prior consent before intercepting Plaintiff's and the Class members' electronic communications; and

(5) Whether Defendant is liable for damages, and the amount of such damages.

76.     The common questions in this case are capable of having common answers. If Plaintiff's claim that Defendants routinely intercepts electronic communications without securing prior consent is accurate, Plaintiff and the Class members will have identical claims capable of being efficiently adjudicated and administered in this case.

**TYPICALITY**

77.     Plaintiff's claims are typical of the claims of the Class members, as they are all based on the same factual and legal theories.

**PROTECTING THE INTERESTS OF THE CLASS MEMBERS**

78.     Plaintiff is a representative who will fully and adequately assert and protect the interests of the Class and has retained competent counsel. Accordingly, Plaintiff is an adequate representative and will fairly and adequately protect the interests of the Class.

**SUPERIORITY**

79.     A class action is superior to all other available methods for the fair and efficient adjudication of this lawsuit because individual litigation of the claims of all members of the Class is economically unfeasible and procedurally impracticable. While the aggregate damages sustained

by the Class are potentially in the millions of dollars, the individual damages incurred by each member of the Class resulting from Defendant's wrongful conduct are too small to warrant the expense of individual lawsuits. The likelihood of individual Class members prosecuting their own separate claims is remote, and, even if every member of the Class could afford individual litigation, the court system would be unduly burdened by individual litigation of such cases.

80.     The prosecution of separate actions by members of the Class would create a risk of establishing inconsistent rulings and/or incompatible standards of conduct for Defendant.  For example, one court might enjoin Defendant from performing the challenged acts, whereas another may not.  Additionally, individual actions may be dispositive of the interests of the Class, although certain class members are not parties to such actions.

**COUNT I**
**Violations of the WESCA, 18 Pa. Cons. Stat. 5701,** *et seq*.
**(On Behalf of Plaintiff and the Class)**

81.     Plaintiff re-alleges and incorporates the foregoing allegations as if fully set forth herein.

82.     The Pennsylvania Wiretap and Electronic Surveillance Control Act (the "Act") prohibits (1) the interception or procurement of another to intercept any wire, electronic, or oral communication; (2) the intentional disclosure of the contents of any wire, electronic, or oral communication that the discloser knew or should have known was obtained through the interception of a wire, electronic, or oral communication; and (3) the intentional use of the contents of any wire, electronic, or oral communication that the discloser knew or should have known was obtained through the interception of a wire, electronic, or oral communication. 18 Pa. Cons. Stat. § 5703.

83. An "intercept[ion]" is the "[a]ural or other acquisition of the contents of any wire, electronic or oral communication through the use of any electronic, mechanical or other device". *See* 18 Pa. Cons. Stat. § 5702.

84. Any person who intercepts, discloses, or uses or procures any other person to intercept, disclose, or use, a wire, electronic, or oral communication in violation of the Act is subject to a civil action for (1) actual damages, not less than liquidated damages computed at the rate of $100/day for each violation or $1,000, whichever is higher; (2) punitive damages; and (3) reasonable attorneys' fees and other litigation costs incurred. 18 Pa. Cons. Stat. § 5725(a).

85. Defendant procured at least one third party Session Replay Provider to automatically and secretly spy on, and intercept, Defendant's website visitor's electronic communications with Defendant in real-time.

86. To facilitate this wiretap, Defendant procured and installed its Session Replay Provider's code on its website.

87. In the context of wiretapping, software can constitute a device. *See United States v. Barrington*, 648 F.3d 1178, 1201 n.23 (11th Cir. 2011) (holding a device includes "innovative means that parties use to gain unauthorized information.").

88. The session replay software code procured from the Session Replay Provider(s) by Defendant is a sophisticated system capable of capturing, recording, interpreting, reformatting, and processing electronic communications, and is therefore an "electronic, mechanical, or other device" as defined by the WESCA. *See* 18 Pa. Cons. Stat. § 5702.

89. The session replayed software code procured from the Session Replay Provider(s) by Defendant is not a "tracking device" because, as stated above, it is a sophisticated system with

capabilities well beyond "*only* the tracking of the movement of a person or object." *See* 18 Pa. Cons. Stat. § 5702.

90.     Upon information and belief, Defendant knew that its Session Replay Provider(s) would add the contents of its visitor's private electronic communications procured through the wiretap, to its back-end database, resulting in the unauthorized disclosure of such information to the Session Replay Provider(s) and risking the further disclosure of that information to others.

91.     Defendant intentionally procured the interception of the content of Defendant's website visitors' private electronic communications in real-time through the Session Replay Provider.

92.     Plaintiff and the putative class members engaged in electronic communications with Defendant through use of Defendant's website, which conveyed the intent of their communications.

93.     Plaintiff and the putative class members had a justified and reasonable expectation under the circumstances that their private electronic communications, including the contents of their personal details as described above, would not be intercepted by and exposed to an undisclosed third party. *See In re Google Inc.*, 806 F.3d 125, 151 (3d Cir. 2015); *see also In re Nickelodeon Consumer Privacy Litig.*, 827 F.3d 262, 293-94 (3d Cir. 2016).

94.     Nonetheless, Defendant employed its Session Replay Provider to intercept the content of Plaintiff's and the putative class members' electronic communications with Defendant.

95.     Because the code is secret and encrypted, Plaintiff and the putative class members were not aware that their electronic communications were being intercepted by Defendant's Session Replay Provider.

96.     Plaintiff and the putative class members did not give prior consent to having their communications intercepted by Defendant or its Session Replay Provider.

97.     By procuring its Session Replay Provider(s) to intercept, record, interpret, reproduce and store Plaintiff's and the Class members private electronic communications for its own purposes without prior consent, Defendant violated 18 Pa. Cons. Stat. § 5703(1), (2) and (3).

98.     At all times pertinent hereto, Defendant's conduct was knowing and intentional.

99.     As a result of Defendant's conduct, and pursuant to § 5725 of the WESCA, Plaintiff and the other members of the putative Class were harmed and are each entitled to actual damages, liquidated damages, punitive damages, reasonable attorneys' fees and costs. 18 Pa. Cons. Stat § 5725(a).

**WHEREFORE**, Plaintiff, on behalf of herself and the other members of the Class, prays for the following relief:

a.     An order certifying the Class and appointing Plaintiff as Class Representative and her counsel as Class Counsel;

b.     An award of actual damages, statutory damages, liquidated damages, and/or punitive damages;

c.     An aware of reasonable attorney's fees and costs; and

d.     Such further and other relief the Court deems reasonable and just.

## JURY DEMAND

Plaintiff and Class Members hereby demand a trial by jury on all issues so triable.

## DOCUMENT PRESERVATION DEMAND

Plaintiff demands that Defendant take affirmative steps to preserve all records, lists, electronic databases or other itemizations associated with the allegations herein, including all

records, lists, electronic databases or other itemizations in the possession of any vendors, individuals, and/or companies contracted, hired, or directed by Defendant to assist in sending the alleged communications.

Dated: April 18, 2023                    Respectfully Submitted,

By: **MARCUS ZELMAN LLC**

*/s/ Ari H. Marcus*
Ari H. Marcus, Esq. (Pennsylvania Bar
No. 322283)
701 Cookman Avenue, Suite 300
Asbury Park, New Jersey 07712
Telephone: (732) 695-3282
Fascimile: (732) 298-6256
Ari@marcuszelman.com
*Counsel for Plaintiff and Proposed Class*

## CERTIFICATION PURSUANT TO LOCAL RULE 11.2

I, Ari H. Marcus, the undersigned attorney of record for Plaintiff, do hereby certify to my own knowledge and based upon information available to me at my office, the matter in controversy is not the subject of any other action now pending in any court or in any arbitration or administrative proceeding.

Dated: April 18, 2023                    */s/ Ari H. Marcus*
                                          Ari H. Marcus, Esq.

26

# EXHIBIT A

Case 1:22-cv-01432-CCE    Document 77    Filed 04/28/23    Page 36 of 42



**What**   michaels

**Where**   Pennsylvania

Search

Date posted ▾      Salary estimate ▾      Employment type ▾      Shift and schedule ▾

Location ▾      Company ▾      Posted by ▾      Experience level ▾      Education ▾



# Michaels

michaels jobs in Pennsylvania

**Upload your resume** - Let employers find you

michaels jobs in Pennsylvania

Sort by: **relevance** - date                                          168 jobs  ?

## Early Morning Stocking crew PT

Michaels Stores, Inc.  **3.5**

Quakertown, PA 18951

📇 *Estimated $22.7K - $28.7K a year*  ?     💼 Part-time     🕐 Weekend availability

- Maintain store recovery standards to deliver our Brand Promises.
- Adhere to Standard Operating Procedures (SOP's) and Company programs to ensure compliance to...

Posted 2 days ago   ·   More...

## Sales Team Member

Michaels Stores, Inc.  **3.5**

Temple, PA 19560

Case 2:22-cv-01432-CCC   Document 76   Filed 04/28/23   Page 37 of 42

Estimated $25K - $31.6K a year  ❓   💼 Part-time   🕐 Weekend availability

- Maintain store recovery standards to deliver our Brand Promises.
- Adhere to Standard Operating Procedures (SOP's) and Company programs to ensure compliance to...

Posted 30+ days ago   ·   More...

---

### morning online order Team member                                   ⋮

Michaels Stores, Inc.  **3.5**

State College, PA 16803

Estimated $21.3K - $27K a year  ❓   💼 Part-time   🕐 Weekend availability

- Deliver friendly customer service, help customers shop our store and find what they're looking for.
- Ensure all customers receive a fast and friendly checkout...

Posted 30+ days ago   ·   More...

---

### Team Member                                                        ⋮

Michaels Stores, Inc.  **3.5**

Philadelphia, PA 19148 (Riverfront area)

🚌 Pier 70 Walmart & Home Depot

Estimated $21.3K - $27K a year  ❓   💼 Part-time   🕐 Weekend availability

- Deliver friendly customer service, help customers shop our store and find what they're looking for.
- Ensure all customers receive a fast and friendly checkout...

Posted 4 days ago   ·   More...

---

### Midnight Truck Unload/Early Morning Stocking                        ⋮

Michaels Stores, Inc.  **3.5**

Harrisburg, PA 17112

Estimated $24.7K - $31.2K a year  ❓   💼 Part-time   🕐 Weekend availability

- Deliver friendly customer service, help customers shop our store, and find what they're looking for.
- Ensure all customers receive a fast and friendly checkout...

Case 1:22-cv-01432-CCC   Document 76   Filed 04/21/23   Page 38 of 42

Posted 10 days ago   ·   More...

---

## Is your resume apply-ready?   ✕

Get professional resume help from Indeed

**Request a resume review or rewrite  →**

---

### Midnight truck stocker 317/1586                    ⋮

Michaels Stores, Inc.  **3.5**

Langhorne, PA 19047

🚌 Mall Blvd & Lincoln Hwy

📷 *Estimated $22.6K - $28.6K a year* ❓      💼 Part-time      🕐 Weekend availability

- Deliver friendly customer service, help customers shop our store, and find what they're looking for.
- Ensure all customers receive a fast and friendly checkout...

Posted 2 days ago   ·   More...

---

### Customer Service Team Member                    ⋮

Michaels Stores, Inc.  **3.5**

Lebanon, PA 17042

📷 *Estimated $21.1K - $26.7K a year* ❓      💼 Part-time      🕐 Weekend availability

- Deliver friendly customer service, help customers shop our store, and find what they're looking for.
- Ensure all customers receive a fast and friendly checkout...

Posted 9 days ago   ·   More...

---

### FRAMER-10                    ⋮

Michaels Stores, Inc.  **3.5**

Wilkes-Barre, PA 18702

🚌 Arena Hub Barnes & Noble O

📷 *Estimated $39.8K - $50.4K a year* ❓      💼 Part-time      🕐 Weekend availability

- Build customer relationships while creating a memorable framing solution for their art.
- Help customers shop our store and be able to find what they're looking...

Posted 30+ days ago  ·  More...

### Early Morning Maintenance 317/9811 King of Prussia

Michaels Stores, Inc.  **3.5**

King of Prussia, PA 19406

🚌 Dekalb Pk & Town Ctr Rd

💼 *Estimated $22.5K - $28.5K a year* ❓   🧳 Part-time   🕐 Weekend availability

- Deliver friendly customer service, help customers shop our store and find what they're looking for.
- Ensure all customers receive a fast and friendly checkout...

Posted 30+ days ago  ·  More...

### Service Team Member

Michaels Stores, Inc.  **3.5**

Springfield, PA 19064

🚌 Baltimore Pk & Saxer Av

💼 *Estimated $21.1K - $26.8K a year* ❓   🧳 Part-time   🕐 Weekend availability

- Deliver friendly customer service, help customers shop our store, and find what they're looking for.
- Ensure all customers receive a fast and friendly checkout...

Posted 12 days ago  ·  More...

### Popular companies hiring now

### Service Team Member

Michaels Stores, Inc.  **3.5**

Butler, PA 16001

💵 *Estimated $21.1K - $26.8K a year* ❓     💼 **Part-time**     🕐 **Weekend availability**

- Deliver friendly customer service, help customers shop our store, and find what they're looking for.
- Ensure all customers receive a fast and friendly checkout...

Posted 3 days ago · More...

## Customer Experience Manager                                                              ⋮

Michaels Stores, Inc.  **3.5**

Uniontown, PA 15401

💵 *Estimated $46K - $58.2K a year* ❓     💼 **Full-time**     🕐 **Weekend availability**

- Deliver a customer centric shopping experience by managing and delivering effective front-end operations and expectations.
- Lead the omni channel processes.

Posted 30+ days ago · More...

## Whitehall pa Team member pt                                                              ⋮

Michaels Stores, Inc.  **3.5**

Whitehall Township, PA 18052

🚌 Grape & Macarthur

💵 *Estimated $21.6K - $27.3K a year* ❓     💼 **Part-time**     🕐 **Weekend availability**

- Deliver friendly customer service, help customers shop our store and find what they're looking for.
- Ensure all customers receive a fast and friendly checkout...

Posted 30+ days ago · More...

## Service Team Member                                                                      ⋮

Michaels Stores, Inc.  **3.5**

Pottsville, PA 17901

💵 *Estimated $26.1K - $33.1K a year* ❓     💼 **Part-time**     🕐 **Weekend availability**


- ○ Deliver friendly customer service, help customers shop our store, and find what they're looking for.
- ○ Ensure all customers receive a fast and friendly checkout...

Posted 30+ days ago · More...

### PT Sales Team member

⋮

Michaels Stores, Inc. **3.5**

Quakertown, PA 18951

💷 *Estimated $21.6K - $27.3K a year* ⍰   💼 **Part-time**   🕐 **Weekend availability**

- ○ Maintain store recovery standards to deliver our Brand Promises.
- ○ Adhere to Standard Operating Procedures (SOP's) and Company programs to ensure compliance to...

Just posted · More...



## People also searched:

| target | part time | hobby lobby | hiring immediately |

| walmart | petsmart | work from home | tj maxx |

| five below | retail |

**Resume Resources:** Resume Samples - Resume Templates

**Career Resources:** Career Explorer - Salary Calculator

**Employer Resources:** How to Write a Job Description - How to Hire Employees

Hiring Lab   Career Advice   Browse Jobs   Browse Companies   Salaries   Find Certifications

Browse Schools   Indeed Events   Work at Indeed   Countries   About   Help Center

ESG at Indeed

© 2023 Indeed   Your Privacy Choices ☑️❌   Accessibility at Indeed   Privacy Center   Cookies

Case 1:22-cv-01482-CCC   Document 76   Filed 04/28/23   Page 42 of 42

# Let Employers Find You

**Upload Your Resume**